IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                          No. CR 08-1419 JB

MARK SEDILLO,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Motion to Suppress Evidence Unlawfully Seized from Defendant's Vehicle and Home, filed November 3, 2009 (Doc. 26). The Court held an evidentiary hearing on December 10, 2009. The primary issues are: (i) whether Defendant Mark Sedillo gave voluntary, uncoerced consent to Albuquerque Police Department ("APD") Officer T.D. Guenther to search M. Sedillo's vehicle; and (ii) whether APD's search of M. Sedillo's residence pursuant to a search warrant that contained information acquired during the vehicle search was valid. The Court finds that M. Sedillo consented to Guenther's search of his vehicle and that such consent was voluntarily given. The Court also finds that, regardless whether the resulting warrant showed probable cause to search M. Sedillo's home, the good-faith exception applied. The Court will therefore deny the motion to suppress.

**FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules

of Evidence, which requires the Court to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      On January 9, 2008, in the winter, APD Officer Bobbie Lucero of APD's Southeast Community Resource Team received an anonymous tip who said that M. Sedillo and his wife, Juanita Sedillo, were trafficking in narcotics out of his home at 412 California S.E. in Albuquerque, New Mexico.  See Transcript of Hearing at 9:3-13 (taken December 10, 2009)(Guenther)("Tr.");[1] Government's Exhibit 2, at 3-4 (dated January 10, 2008), filed November 3, 2009 (Doc. 26-2)("Warrant and Affidavit").

2.      The caller gave APD a physical description of M. Sedillo and J. Sedillo.  See Warrant and Affidavit at 4.

3.      The caller also said that J. Sedillo possibly had an outstanding arrest warrant and that two children were present at the residence.  See Warrant and Affidavit at 4.

4.      Lucero told Guenther about the anonymous tip that she received regarding M. Sedillo.  See Tr. at 9:3-13 (Guenther).

5.      Guenther is a retired United States Marine with twenty-one years of service before his retirement, and he has been a police officer with the Albuquerque Police Department since

---

[1] The Court's citation to the transcript refers to the court reporter's original, unedited version. The final transcript may contain slightly different page and/or line numbers.

approximately 2001.  <u>See</u> Tr. at 5:13-25 (Guenther).

6.      Based on the anonymous tip, Lucero conducted surveillance of M. Sedillo's home at  412 California S.E. on the night of January 9, 2008.  <u>See</u> Tr. at 9:16-10:3 (Valencia, Guenther); Warrant and Affidavit at 4.

7.      After approximately twenty minutes of surveillance, Lucero observed a dark-colored sport-utility vehicle ("SUV") arrive at the residence.  <u>See</u> Warrant and Affidavit at 4.

8.      Two to three minutes after the SUV arrived, Lucero observed a male matching M. Sedillo's description arrive at the residence in a silver Lincoln Towncar.  <u>See</u> Warrant and Affidavit at 4.

9.      An unidentified female was driving the SUV and remained inside the vehicle until M. Sedillo's arrival.  <u>See</u> Warrant and Affidavit at 4.

10.      M. Sedillo exited his vehicle, approached the SUV, and made contact with the female.  <u>See</u> Warrant and Affidavit at 4.

11.      Following the contact, M. Sedillo approached the front door of the residence and gained access to the residence with a key.  <u>See</u> Warrant and Affidavit at 4.

12.      The unidentified female entered the residence approximately two minutes later.  <u>See</u> Warrant and Affidavit at 4.

13.      Lucero contacted Guenther and asked him to run the licensed plates of the vehicles parked outside that residence through the New Mexico Motor Vehicle Department ("MVD") database.  <u>See</u> Tr. at 10:7-19 (Guenther),

14.      When Guenther ran the license plate of one of the vehicles parked outside 412 California S.E. on January 9, 2008, the licensed plate returned a "skip."  Tr. at 10:7-19 (Guenther).

15.      A "skip" means that there was no vehicle associated with the license plate when

inquiry was made in the MVD vehicle-information database.  Tr. at 16:22-17:18 (Valencia, Guenther).

16.     Lucero continued her investigation and learned that a female known as Juanita Candelaria had listed the 412 California S.E. address when she was booked into the Bernalillo County Detention Center ("BCDC") on January 20, 2007, and that she had also named M. Sedillo as an emergency contact on her booking information.  <u>See</u> Warrant and Affidavit at 4.

17.     Lucero located a booking photograph of M. Sedillo from the BCDC and found it to be the same person whom she observed arrive at 412 S.E. on January 9, 2008, in the Lincoln Towncar.  <u>See</u> Warrant and Affidavit at 4.

18.     According to the record Lucero located, M. Sedillo had pled guilty to Conspiracy to Commit a Crime, Aggravated Assault Against a Household Member, and Robbery on May 29, 1998, and that he had pled guilty to Aggravated Assault with a Deadly Weapon, Abuse of a Child, Tampering with Evidence, and Possession of a Firearm/Destructive Device by a Felon.  <u>See</u> Warrant and Affidavit at 4-5.

19.     Lucero also learned that M. Sedillo has a case pending involving Armed Robbery with a Deadly Weapon, Conspiracy to Commit Armed Robbery with a Deadly Weapon, and Possession of a Firearm/Destructive Device by a Felon.  <u>See</u> Warrant and Affidavit at 5.

20.     The next day, January 10, 2008, Lucero was back at M. Sedillo's home conducting surveillance, when M. Sedillo left his home in a Lincoln Towncar vehicle.  <u>See</u> Tr. at 10:23-12:10 (Valencia, Guenther).

21.     At approximately 4:40 p.m., Lucero drove past 412 California S.E. and observed M. Sedillo exit the residence, enter the Lincoln Towncar, and drive away from the residence.  <u>See</u> Tr. at 10:23-12:10 (Valencia, Guenther).

22.     Lucero radioed to other officers that the vehicle driven by M. Sedillo was mobile, and Lucero gave them the license-plate number.  See Tr. at 10:23-12:10 (Valencia, Guenther).

23.     Lucero had radio contact with Guenther, who was on patrol, advising him of Sedillo's departure from his home.  See Tr. at 10:23-12:10 (Valencia, Guenther).

24.     Lucero told Guenther to use caution when dealing with M. Sedillo because of his past violent criminal history and also because M. Sedillo was known to carry firearms.  See Warrant and Affidavit at 5.

25.     Guenther observed M. Sedillo's Lincoln Towncar vehicle.  See Tr. at 12:7-12 (Valencia, Guenther).

26.     Guenther already knew that M. Sedillo's vehicle license plate would return as a "skip" because he had run the license plate through the MVD database for Lucero the previous night.  Tr. at 10:7-19 (Guenther); id. at 12:7-10 (Valencia, Guenther); id. at 12:23-25 (Guenther).

27.     Upon locating the vehicle that Guenther believed M. Sedillo was driving, Guenther also noticed it had a large lateral crack in the windshield.  See Tr. at 12:14-20 (Guenther).

28.     Guenther believed that he had authority to stop M. Sedillo's vehicle because of a windshield crack and because of a discrepancy concerning the vehicle's license plate.  See Tr. at 35:16-36:24 (Gonzales, Guenther).

29.     Guenther's intention when executing the stop of M. Sedillo's vehicle was to confirm that the driver was, in fact, M. Sedillo.  See Tr. at 35:16-36:24 (Gonzales, Guenther).

30.     During the hearing, Guenther identified M. Sedillo as the person driving the vehicle that he pulled over on January 10, 2008.  Tr. at 14:16:24 (Valencia, Guenther, Court).

31.     Guenther stopped M. Sedillo's vehicle at or near 330 Louisiana Boulevard, NE in Albuquerque.  See Tr. at 23:6-11 (Valencia, Guenther); Warrant and Affidavit at 4.

32.     The Court takes judicial notice that 330 Louisiana Boulevard is located between Lomas Boulevard and Central Avenue, a stretch of road that is not densely populated but which has consistent traffic in both directions and several small businesses.[2]

33.     At the time of the stop, M. Sedillo was seated in his vehicle.  See Tr. at 14:16:24 (Valencia, Court)(clarifying that Guenther identified M. Sedillo as the driver of the vehicle).

34.     Guenther told M. Sedillo that he stopped M. Sedillo's vehicle because M. Sedillo's windshield had a crack in it and because M. Sedillo's license plate returned as a "skip."  Tr. at 72:12-23 (Gonzales, Sedillo); Government's Exhibit 3 (Belt Tape Recording of Officer T.D. Guenther) at 0:50-1:50 (recorded January 10, 2008)(Guenther's Belt Tape).

35.     Guenther requested a driver's license, proof of insurance, and vehicle registration. See Tr. at 15:2-20 (Valencia, Guenther); id. at 72:12-23 (Gonzales, Sedillo); Guenther's Belt Tape at 0:10-0:22.[3]

36.     M. Sedillo told Guenther that he did not have his driver's license with him.  See Tr. at 15:10-16:9 (Valencia, Guenther); Guenther's Belt Tape at 0:10-0:30; Warrant and Affidavit at 5.

---

[2] The Court takes judicial notice of this fact sua sponte, pursuant to rule 201(c) of the Federal Rules of Evidence, to fully analyze whether M. Sedillo's consent was voluntary.  See United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006)(listing, as a factor in the voluntariness analysis, whether the traffic stop was in a public or secluded location).  The Court finds that this is a fact that is generally known within the territorial jurisdiction of the Court.  The Court bases its finding on the Court's personal experience as a resident of Albuquerque, New Mexico, supplemented by a search via Google Maps to pinpoint precisely where, on Louisiana Boulevard, 330 Louisiana is located.

[3] In his motion, M. Sedillo argued that, considering that M. Sedillo produced proper documentation of his vehicle being lawfully registered with the MVD, it is questionable whether M. Sedillo's vehicle license plate actually returned as a "skip."  Motion at 5-6 n.2.  At the hearing on this motion, however, counsel explored in greater depth that question, and Guenther explained that there are several reasons why a registered car might not appear in the MVD's database, such as a third-party registration company not following through with and entering the registration information in the proper MVD database.  Accordingly, the Court credits Guenther's testimony as to the basis for the traffic stop.  See Tr. at 16:22-17:16 (Valencia, Guenther).

37.     Because M. Sedillo could not produce his driver's license to Guenther, Guenther asked M. Sedillo for his vital information -- name, date of birth, social security number, and address. M. Sedillo provided the information Guenther requested.   See Tr. at 15:12-16 (Guenther); Guenther's Belt Tape at 0:25-0:50.

38.     M. Sedillo provided Guenther with his vehicle-registration documentation from the MVD, which indicated that the vehicle he was driving was registered in his name.   See Tr. at 15:10-16:9 (Valencia, Guenther); Guenther's Belt Tape at 0:10-0:30.

39.     M. Sedillo also presented Guenther with proof of insurance.   See Tr. at 16:1-9 (Valencia, Guenther); Guenther's Belt Tape at 0:10-0:30; Warrant and Affidavit at 5.

40.     During M. Sedillo's encounter with Guenther, M. Sedillo looked unusually nervous and was shaking. Tr. at 18:3-19:3 (Valencia, Guenther); Guenther's Belt Tape at 1:45-2:00 ("You're shaking like a wet leaf, dude.  Are you nervous?").

41.     M. Sedillo responded that he was merely cold, and not nervous, but admitted that it could reasonably appear to an observer that he was nervous.   See Tr. at 90:24-91:12 (Valencia, Sedillo); Guenther's Belt Tape at 1:45-2:00 .

42.     Guenther walked away to check on the paperwork that M. Sedillo had handed to him. See Tr. at 16:11-15 (Guenther).

43.     Through further investigation, Guenther determined that M. Sedillo had a valid driver's license, that his vehicle was properly registered, and that his vehicle had proper insurance. See Tr. at 15:10-16:21 (Guenther); Warrant and Affidavit at 5.

44.     Guenther discovered that M. Sedillo had a valid driver's license, even though M. Sedillo did not have it with him at the time that Guenther pulled him over.   See Tr. at 16:11-21 (Guenther); Warrant and Affidavit at 5.

45.     While checking M. Sedillo's information, Lucero contacted Guenther, and informed him that M. Sedillo was out on bond for attempted armed robbery and possession of narcotics. <u>See</u> Tr. at 17:17-18:2 (Valencia, Guenther).

46.     When Guenther determined that M. Sedillo was on bond for armed robbery, Guenther decided that he would like to search M. Sedillo's vehicle. <u>See</u> Tr. at 36:25-37:9 (Gonzales, Guenther).

47.     Guenther knew that he needed M. Sedillo's consent to search M. Sedillo's vehicle. <u>See</u> Tr. at 36:25-37:9 (Gonsalez, Guenther).

48.     Guenther came back to M. Sedillo's vehicle approximately five minutes later. <u>See</u> Tr. at 75:6-12 (Gonzales, Sedillo).

49.     When Guenther returned to M. Sedillo's car, he immediately returned M. Sedillo's paperwork. <u>See</u> Tr. at 75:13-17 (Gonzales, Sedillo); Guenther's Belt Tape at 2:00-2:15.

50.     Guenther explained that, because of the nature of the charge for which he was out on bond, he wanted to "check," <u>i.e.</u>, search, M. Sedillo's car for weapons or "dope," <u>i.e.</u>, drugs. <u>See</u> Tr. at 19:7-24 (Guenther); Warrant and Affidavit at 5; Guenther Belt Tape at 2:10-2:35.

51.     Guenther told M. Sedillo that the reasons why he was going to search M. Sedillo's vehicle were because M. Sedillo was out on bond for armed robbery, and thus he needed to check for weapons or "dope" given the charge for which M. Sedillo was out on bond. Tr. at 75:15-20 (Gonzales, Sedillo)("He hands me back my paperword and said, 'well here's your paperwork back. Now I need you to step out of the vehicle.' And he said, 'Can I search your vehicle?'"); Guenther Belt Tape at 2:10-2:35 ("Okay. So, all I'm going to do here is -- I'm going to make sure you don't have any weapons; no weapons or dope or anything in the car, given the charges that you are out on bond for. Is that alright? Cool?").

52.     After explaining why he wanted to search M. Sedillo's vehicle, Guenther asked M. Sedillo – once before and once after M. Sedillo exited his vehicle -- if it was "all right," and if it was "cool." Tr. at 20:15-23 (Valencia, Guenther); Guenther Belt Tape at 2:10-3:00.[4]

53.     Guenther used a polite voice when addressing M. Sedillo.  See Tr. at 76:13-17 (Gonzales, Sedillo)("Q:  When Officer Guenther was talking to you, what tone of voice did he use with you?  What did you hear?  A:  Like a polite voice.  Q:  Okay.  So he wasn't being mean?  A:  No."); Guenther's Belt Tape at 0:10-3:00.

54.     While Guenther spoke with M. Sedillo, two other police officers were in the vicinity, but they did not approach M. Sedillo until immediately before the search was executed.  See Tr. at 19:9-20:11 (Guenther); id. at 76:18-77:22 (Gonzales, Sedillo).

55.     M. Sedillo still appeared very nervous when Guenther asked if the police could search M. Sedillo's vehicle.  See Tr. at 22:25-23:5 (Valencia, Guenther).

56.     M. Sedillo nodded his head up and down, and made a sound that Guenther believed was an affirmation and consent to the search that Guenther proposed.  See Tr. at 19:9-20:11

---

[4] Guenther's belt-tape recording reflects the following:

GUENTHER:  May I ask you if you would step outside?  I want you to -- the reason I'm going to do this is because . . . you are out on bond, right?

* * * *

GUENTHER:  Okay.  So, all I'm going to do here is -- I'm going to make sure you don't have any weapons; no weapons or dope or anything in the car, given the charges that you are out on bond for.  Is that alright?  Cool?

* * * *

GUENTHER:  We are gonna search for dope or weapons, is that cool?

Guenther Belt Tape at 2:10-3:00.

(Guenther); id. at 20:18-23 (Guenther); Warrant and Affidavit at 5.[5]

57.     If M. Sedillo had refused to allow Guenther to search his vehicle, Guenther would

not have executed the search.  See Tr. at 21:3-4 (Guenther)("If he had said no, then that would have

been the end of it right there.").

58.     M. Sedillo knew that Guenther was asking him for permission to search his vehicle,

rather than simply telling him that a search was imminent.  See Tr. at 95:8-20 (Valencia,

Sedillo)("Q:  In other words, you knew that he was asking your permission to search your vehicle,

right?  A:  Yeah.").

59.     M. Sedillo knew, from prior experience in the criminal justice system, that he had

the right to refuse Guenther's request to search his vehicle.  See Tr. at 82:18-20 (Valencia, Sedillo);

id. at 85:24-86:10 (Valencia, Sedillo)("Q:   So you knew -- you knew that you could tell them, 'I

don't want you to search my car?'   A:   Yes, sir.");  id. at 87:8-12 (Valencia, Sedillo).

60.     Although Guenther phrased his request in the form of an assertion followed by a

request for confirmation -- e.g., "I'm going to do this, is that alright?" -- the Court finds that

Guenther was genuinely asking for permission, rather than disguising a forceful instruction.  See Tr.

at 75:15-17; Guenther's Belt Tape at 2:10-3:00.

61.     M. Sedillo gave Guenther his permission, i.e., consent, for Guenther or other APD

officers to search his vehicle.  See Tr. at 19:9-20:11 (Guenther); id. at 20:18-23 (Guenther); 24:24-

_____

[5]M. Sedillo maintains that he shook his head from side to side, signifying that he did not consent to the search.  See Tr. at 79:16-80:22 (Gonzales, Sedillo).  The Court found Guenther's testimony to be credible, and thus credits his testimony on this factual issue.  M. Sedillo also testified that he said something to the effect that Guenther would search his car regardless of what M. Sedillo said in response to Guenther's inquiry.  See Tr. at 75:15-22 (Sedillo).  Neither the Court, in listening to Guenther's belt tape, nor Guenther, in his testimony, recalled hearing such words from M. Sedillo.  See Guenther's Belt Tape at 0:10-3:30; Tr. at 20:2-11 (Guenther).  The Court thus finds that, if M. Sedillo intended to say something to that effect, he did so too quietly for Guenther to hear.

25:10 (Valencia, Guenther).

62.     M. Sedillo gave no indication to Guenther that he did not consent to the search.  See Tr. at 19:9-20:11, 20:18-23, 25:5-7 (Guenther).[6]

63.     M. Sedillo understood that, if he consented to the search, he would not be able to leave the area with his car until the search was completed.

64.     Guenther did not threaten M. Sedillo to coerce him to exit the car.  See Tr. at 22:13-16 (Valencia, Guenther); Guenther's Belt Tape at 0:10-3:40.

65.     Guenther did not draw his weapon or place his hand in a threatening manner on his weapon.  See Tr. at 47:15-48:7 (Gonzales, Guenther); id. at 51:16-52:18 (Valencia, Guenther).

66.     Guenther did not touch M. Sedillo until M. Sedillo exited his vehicle and consented to a pat-down search.  See Tr. at 14:19-24 (Gonzales, Guenther).

67.     The conversation between Guenther and M. Sedillo concerning the reason for the stop took approximately two minutes.  See Tr. at 74:19-75:1 (Gonzales, Sedillo) (estimating that his brief talk with Guenther at the window of his car took "[a]bout five minutes"); Guenther's Belt Tape at 0:10-2:05.

68.     No more than fifteen minutes elapsed between the time Guenther pulled over M. Sedillo and the time M. Sedillo gave Guenther consent to search his vehicle.  See Tr. at 26:6-15 (Valencia, Guenther).

69.     During that questioning, M. Sedillo told Guenther that he is a convicted felon.  See

---

[6] M. Sedillo maintains that he gave indications that he did not truly consent to the search, and that he felt that he had no choice and was therefore coerced into giving consent to Guenther.  See Tr. at 97:13-99:16 (Gonzales, Sedillo).  The Court does not find that M. Sedillo gave any indications which a reasonable police officer would have thought indicated lack of consent.  Moreover, M. Sedillo's internal thoughts and feelings are irrelevant as long as he objectively manifested consent and Guenther's actions were not, from an objective standpoint, non-coercive.

Guenther's Belt Tape at 5:00-5:30.

70.     M. Sedillo was seated in the car during the entire conversation.  <u>See</u> Tr. at 44:24-45:5 (Gonzales, Guenther).

71.     Guenther told M. Sedillo to step out of his car.  <u>See</u> Tr. at 45:5-11 (Gonzales, Guenther); Guenther's Belt Tape at 2:15-2:35.

72.     M. Sedillo complied with all of Guenther's requests.

73.     M. Sedillo exited the car, then turned around with his back to Guenther, and placed his hands at the base of his neck.  <u>See</u> Tr. at 19:9-20:11 (Valencia, Guenther); <u>id.</u> at 50:25-51:7 (Valencia, Guenther).

74.     Guenther conducted a pat-down search of M. Sedillo's person.  <u>See</u> Tr. at 45:19-24 (Gonzales, Guenther); Warrant and Affidavit at 5.

75.     The pat-down revealed a large bulging object in M. Sedillo's front pocket, which appeared to bulge open because of its contents and because of the baggy shorts that M. Sedillo was wearing.  <u>See</u> Warrant and Affidavit at 5.

76.     Guenther saw a large bundle of cash inside M. Sedillo's pocket.  <u>See</u> Tr. at 78:6-18 (Sedillo); Warrant and Affidavit at 5.

77.     Guenther asked M. Sedillo about the money, and M. Sedillo stated that he worked for his father and was paid in cash.  <u>See</u> Warrant and Affidavit at 5; Guenther's Belt Tape at 2:50-3:15.

78.     Following M. Sedillo's exit from the vehicle, and after Guenther patted down M. Sedillo's person,  APD officers began to search M. Sedillo's vehicle.  Warrant and Affidavit at 5-6.

79.     APD Officer Pryde located a digital scale in the driver's side door pocket.  <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 6.

80.     Pryde further observed what appeared to be narcotics -- heroin – residue on the scale. <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 6.

81.     APD Officer Bailey also located a small cloth bag inside the ashtray of the vehicle. <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 6.

82.     The bag contained five small balls of a hard substance wrapped in aluminum foil. <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 5.

83.     The substance in the bag later field-tested presumptively positive for the presence of heroin and weighed approximately 0.9 grams. <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 6.

84.     Bailey also located one yellow-colored .20 gauge shotgun shell ammunition inside the ashtray. <u>See</u> Tr. at 24:18-23 (Valencia, Guenther); Warrant and Affidavit at 6.

85.     After the officers located the shotgun shell, one of them asked M. Sedillo if M. Sedillo had any guns. <u>See</u> Guenther's Belt Tape at .

86.     M. Sedillo's responded that he did not have any guns. <u>See</u> Guenther's Belt Tape at 4:30-4:50.

87.     The same officer then asked M. Sedillo if they could "go look," which the Court finds was a request by the officers to search M. Sedillo's home. Guenther's Belt Tape at 4:30-4:55.

88.     M. Sedillo did not consent to a search of his home. <u>See</u> Guenther's Belt Tape at 4:45-5:00 ("You got a warrant, you know what I mean?  I know my rights.").

89.     Based on the recovery of the narcotics, the scale and the shotgun shell, M. Sedillo was arrested and taken into custody. <u>See</u> Tr. at 25:8-14 (Valencia, Guenther); <u>id.</u> at 46:8-14 (Gonzales, Guenther); Warrant and Affidavit at 6.

90.     While M. Sedillo was in custody, it was determined that he had on his person a total

of $447.00 in United States currency, largely in small denominations.  See Guenther's Belt Tape at 8:55-10:00; Warrant and Affidavit at 5.

91.     It was not until M. Sedillo was taken to the police substation that he was read his Miranda[7] rights.  See Tr. at 25:16-25 (Valencia, Guenther); Guenther's Belt Tape at 6:10-6:40.

92.     After his rights were read to him, M. Sedillo advised APD officers that he did not wish to say anything.  See Tr. at 25:16-25 (Valencia, Guenther); Guenther's Belt Tape at 6:30-6:50.

93.     On that same day, on January 10, 2008, APD officers went to 412 California S.E. for the purpose of securing the residence pending an application for a state search warrant.  See Tr. at 26:16-27:4 (Valencia, Guenther).

94.     Lucero prepared an affidavit for a search warrant.  See Tr. at 26:22-27:6 (Valencia, Guenther); Warrant and Affidavit at 6 (signature of Bobbie Lucero).

95.     The Affidavit for Search Warrant set out facts concerning the surveillance of M. Sedillo's home on January 9, 2009, and the stop of his vehicle on January 10, 2009.  See Warrant and Affidavit at 5-6.

96.     Also contained in the Affidavit for Search Warrant is information concerning M. Sedillo's prior criminal history.  See Warrant and Affidavit at 4-5.

97.     Other than M. Sedillo's possession of the shotgun shell, a digital scale with what appeared to be heroine residue on it, five small quantities of heroin, and the information that an anonymous, uncorroborated tipster provided, the Affidavit for Search Warrant does not contain any information indicating that M. Sedillo or his wife were trafficking narcotics out of their home at 412 California S.E.  See Warrant and Affidavit.

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

98.     The Honorable Stan Whitaker, Second Judicial District Court Judge, approved and signed the search warrant on January 10, 2008 at 9:15 p.m.  See Warrant and Affidavit at 6; Warrant and Affidavit at 1.

99.     APD officers, including Lucero and Guenther, executed the search warrant on January 20, 2008, at or near 10:00 p.m.  See Tr. at 27:24-28:12 (Valencia, Guenther).

100.     Inside the residence, APD officers found and seized a New England Arms, Pardner model, .20 gauge shotgun, serial number NM268557, with a barrel length of approximately twelve inches.  See Indictment at 2, filed June 24, 2008 (Doc. 1).

101.     In the kitchen of the residence, Guenther found a taxation document showing that M. Sedillo was a resident of the house, a plate with what appeared to be heroine residue on it, and, in a closet, a heart-shaped container containing a substance that appeared to be brown tar heroine.  See Tr. at 27:17-23 (Guenther).

102.     On June 27, 2008, based on the materials found during the search of 412 California S.E., M. Sedillo was re-arrested.  See Warrant for Arrest of Mark Sedillo (dated June 24, 2008), filed June 24, 2008 (Doc. 3).

## PROCEDURAL BACKGROUND

A grand jury indicted M. Sedillo on counts of: (i) being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (ii) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (iii) knowingly possessing an unregistered sawed-off shotgun in violation of 26 U.S.C. §§ 5861(d) and 5871.  See Indictment at 1-2.  On November 3, 2009, M. Sedillo moved the Court to suppress the evidence seized from his vehicle and home, allegedly in violation of his right to be free from unlawful search and seizure under the Fourth Amendment of the United States Constitution.  On November 17, 2009, the United States filed its

Response to the Defendant's Motion to Suppress Evidence ("Response"), responding to M. Sedillo's motion to suppress evidence.  See Doc. 29.  M. Sedillo filed a reply on December 3, 2009.  See Reply to Government's Response to Defendant's Motion to Suppress Evidence Filed November 17, 2009, filed December 3, 2009 (Doc. 31)("Reply").

At the hearing, Benjamin Gonzales, M. Sedillo's attorney, explained more clearly that this motion to suppress is multi-tiered.  It first asks the Court to find the search of his vehicle unlawful as done without probable cause and without consent, then asks the Court to strike the information garnered from the vehicle search from the search warrant executed on January 10, 2008, and finally asks the Court to find the search of his home unlawful as done pursuant to a warrant that clearly lacked probable cause.  See Tr. at 100:24-102:16 (Gonzales).[8]  Mr. Gonzales insisted that the first issue the Court must address is whether M. Sedillo voluntarily gave Guenther consent to search the vehicle, and recommended that the Court primarily use Guenther's belt tape recording to make that determination.  See id. at 102:22-103:15 (Gonzales).  Second, he argued that the good-faith exception of United States v. Leon, 468 U.S. 897 (1984), should not apply in this case.  See Tr. at 114:22-115:4 (Gonzales).  Louis E. Valencia, Assistant United States Attorney, argued that the search was constitutional.  See id. at 125:5-18 (Valencia).  Mr. Valencia conceded during the hearing that, if the Court finds the vehicle search was unconstitutional and excises the information garnered from it from the Affidavit for Search Warrant, the resulting affidavit would not be sufficient to establish probable cause.  See id. at 126:1-5 (Valencia).  He nevertheless argued that the United States v. Leon exception should apply in this case.  See id. at 126:6-19 (Valencia).

---

[8] Mr. Gonzales was clear, however, that he did not concede that the search warrant, as executed, was sufficient to establish probable cause to search M. Sedillo's home. See id. at 102:7-21 (Court, Gonzales).

## RELEVANT LAW REGARDING THE FOURTH AMENDMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled by Mapp v. Ohio, 367 U.S. 643 (1961).  It is a well-settled principle that, under the Fourth Amendment, a search conducted without a warrant and without probable cause is unreasonable unless one of the recognized exceptions to the warrant requirement applies.  See Katz v. United States, 389 U.S. 347, 357 (1967); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)("[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.'")(quoting United States v. Ross, 456 U.S. 798, 825 (1982))(quotation marks and alterations in original).  The exceptions relevant to this motion are the automobile exception and consent.

### 1.      Law Regarding the Scope of Traffic Stops.

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823-24 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court of the United States set forth in Terry v. Ohio, 392 U.S. 1 (1968), see United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997).  The Supreme Court in Terry v. Ohio authorized a police officer to conduct a limited seizure of a person, and search of the person's outer clothing, when the officer

has reasonable suspicion that leads him to believe that criminal activity may be afoot, and that persons with whom he is dealing may be armed and presently dangerous.  See Terry v. Ohio, 392 U.S. at 30-31.  The police may conduct the pat-down for purposes of ensuring the officer's and others' safety.  See Terry v. Ohio, 392 U.S. at 30.  The United States Court of Appeals for the Tenth Circuit has concluded that traffic stops fall into the category of a Fourth-Amendment seizure that can be justified on the basis of reasonable suspicion.  See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause.").

For officers to conduct a lawful investigative stop of a vehicle, they must have, based on the circumstances, "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leox-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may only conduct an investigative stop of a vehicle where they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to he engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  The presence of reasonable suspicion is not determined by any one factor, but by the totality of the circumstances known to the officer.  See United States v. Ceballos, No. 09-2021, 2009 WL 4642368, at **2-3 (10th Cir. Dec. 9, 2009) (unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper.  See United States v. Ceballos, 2009 WL 4642368, at *2 (holding that an officer's "subjective characterization of his actions is irrelevant.").

-18-

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop. See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n.1 (10th Cir. 2002) (acknowledging that Whren v. United States "indicate[d] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary)(quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001))(emphasis in original).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully pull over a vehicle that he or she observes to be in violation of the traffic laws.  See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 Fed. Appx. 760, 762 (10th Cir. 2006)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States).  In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also had a constitutional basis for executing the stop.

**2.      Law Regarding Vehicle Searches -- an Exception to the Warrant Requirement.**

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008) ("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United

-19-

States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle without a search warrant.

> **3.    Consent**.

A vehicle search is also constitutionally reasonable if the driver of the vehicle voluntarily consents to the search.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004)(quoting Schneckloth v. Bustamonte).  The Supreme Court has held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of the circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218, 227-28 (1973).  See United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994).  There can be no valid consent to a search by law-enforcement officers if the person consents based upon the officers' assertion that they can make a search in any event, as where they may possess a search warrant.  See Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  The Tenth Circuit has recognized that, when officers rely on consent to justify the lawfulness of a search, the government has the burden of showing that consent was freely

and voluntarily given.  That burden is not met by merely showing acquiescence to an assertion of lawful authority.  See United States v. Rodriguez, 525 F.2d 1313, 1316 (10th Cir. 1975)(holding that passengers did not consent to search where they were ordered to get out of bus and then ordered to open suitcases).  Indeed, "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.  For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."  Schneckloth v. Bustamonte, 412 U.S. at 228.  See United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008).

The Supreme Court and the Tenth Circuit have accumulated a non-exhaustive list of factors that district courts should consider when attempting to discern whether a defendant's consent was voluntarily given: (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's 'pleasant' manner and [] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

## LAW REGARDING THE EXCLUSIONARY RULE

If the police acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an

exception to the exclusionary rule applies.  See United States v. Calandra, 414 U.S. 338, 347 (1974)

("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a

criminal proceeding against the victim of the illegal search and seizure.").  The rule also demands

exclusion of evidence that was obtained as a but-for result of the illegal search, unless the evidence

is so far removed from the constitutional violation that the "taint" of the violation no longer clings

to it.  See Wong Sun v. United States, 371 U.S. at 484 ("The exclusionary prohibition extends as

well to the indirect as the direct products of such invasions.").  On the other hand, "[t]o trigger the

exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully

deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."

Herring v. United States, 129 S. Ct. 695, 702 (2009).  Thus, "the exclusionary rule serves to deter

deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic

negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error

or reckless disregard of constitutional requirements," suppression is not automatic and "any

marginal deterrence" from suppression is often insufficient.  Id. at 702, 704.

    "Whether the exclusionary sanction is appropriately imposed in a particular case, our

decisions make clear, is an issue separate from the question whether the Fourth Amendment rights

of the party seeking to invoke the rule were violated by police conduct."  United States v. Leon, 468

U.S. 897, 906 (citing Illinois v. Gates, 462 U.S. 212, 223 (1983))(internal quotes omitted).

> The essence of a provision forbidding the acquisition of evidence in a certain way
> is that not merely evidence so acquired shall not be used before the Court but that it
> shall not be used at all. Of course this does not mean that the facts thus obtained
> become sacred and inaccessible. If knowledge of them is gained from an independent
> source they may be proved like any others, but the knowledge gained by the
> Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251

U.S. 385, 392 (1920)).  The Tenth Circuit has acknowledged the rule as follows:

> [A] defendant may . . . suppress any . . . evidence deemed to be "fruit of the
> poisonous tree," (i.e., evidence discovered as a direct result of the unlawful activity),
> by showing the requisite factual nexus between the illegality and the challenged
> evidence.  Once the defendant meets this burden, the Government may still avoid
> suppression by proving that the contested evidence is not fruit of the poisonous tree.
> According to the Supreme Court, the overriding issue in "fruits" cases is whether,
> granting establishment of the primary illegality, the evidence to which instant
> objection is made has been come at by exploitation of that illegality or instead by
> means sufficiently distinguishable to be purged of the primary taint.   The
> Government can establish that a particular item of evidence has been purged of the
> primary taint by demonstrating that the evidence would have been inevitably
> discovered, was discovered through independent means, or was so attenuated from
> the illegality as to dissipate the taint of the unlawful conduct.

United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006)(internal citations omitted).

Though the rule is simply stated, courts have been trying to hash out its scope for many years.

Obviously, there exists a great tension in the rule.  The illegal search often results in reliable,
probative, and otherwise-unobtainable evidence of the individual's guilt.  Sometimes the result is
that the court must suppress all evidence in a case, even though the defendant's guilt is almost
certain, because the unconstitutional search taints all the evidence.  In such circumstances, the
individual often cannot be convicted of the crime of which he is clearly guilty.  The Supreme Court
has recognized time and time again, however, that limiting the powers of law enforcers and the
concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth
Amendment's protections.  As Justice Stevens noted in his concurring and dissenting opinion in
United States v. Leon:

> It is of course true that the exclusionary rule exerts a high price -- the loss of
> probative evidence of guilt.  But that price is one courts have often been required to
> pay to serve important social goals.  That price is also one the Fourth Amendment
> requires us to pay, assuming as we must that the Framers intended that its strictures
> "shall not be violated."

United States v. Leon, 468 U.S. at 979 (Stevens, J., concurring and dissenting).  See Kolender v.

Lawson, 461 U.S. 352, 355 (1983)("The price of [law-enforcement] effectiveness, however, is intrusion on individual interests protected by the Fourth Amendment."); United States v. Leon, 468 U.S. at 941 (Brennan, J., dissenting)("It is the loss of that evidence that is the 'price' our society pays for enjoying the freedom and privacy safeguarded by the Fourth Amendment.").

### 1.    The Good-Faith Exception to the Exclusionary Rule.

There are a number of exceptions to the exclusionary rule, but only one that is relevant to this case -- good-faith reliance on a warrant that is later determined to be invalid.  In United States v. Leon, the Supreme Court was faced with the question whether to create an exception to the exclusionary rule when a police officer obtained evidence through the use of a warrant that he or she mistakenly thought probable cause supported.  See United States v. Leon, 468 U.S. at 905.  In short, the Supreme Court found excluding evidence that the officer obtained pursuant to a warrant that he or she reasonably thought to be valid would not deter police misconduct, because the officers had done all they could to comply with the Fourth Amendment.  See 468 U.S. at 918-19.  It further noted that, when a judicial officer issues a warrant on something less than probable cause, the person whose conduct the law wishes to deter is that of the issuing judge, and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court therefore concluded that a court need not suppress evidence seized pursuant to a facially valid warrant that later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not show probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant. See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229

F.3d 1002, 1007 (10th Cir. 2000).

> [T]he suppression of evidence obtained pursuant to a warrant should be ordered only in those unusual cases in which exclusion will further the purposes of the exclusionary rule[.] Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter.

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).

The Tenth Circuit has outlined four situations in which an officer's reliance upon a warrant would be improper.

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d 1007.  If any of these situations is present, the good-faith exception should not be applied and the evidence should be excluded.

### 2.     Warrants Based on Illegally Obtained Information.

When a search is conducted pursuant to a warrant that is based in part on illegally obtained information, a court is not to blindly apply the good-faith exception.  Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed.  If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."); United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.").

### 3.      Herring v. United States.

Last term, the Supreme Court decided a case that may have changed the standard for the good-faith exception to the warrant requirement. In Herring v. United States, 129 S. Ct. 695 (2009), officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama warrant database. See 129 S. Ct. at 698. In the search incident to that arrest, officers found drugs and a gun on Herring's person. See id. Herring was then indicted on federal gun and drug-possession charges. See id. at 699. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the warrant database had never been updated to reflect that fact. See 129 S. Ct. at 698. Asserting that the officer found the evidence as a result of an unlawful arrest, Herring sought to suppress the evidence found in the search. See id. at 699. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. See 129 S. Ct. at 699.

The Supreme Court in Herring v. United States likewise affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See Herring v. United States, 129 S. Ct. at 700. The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Id. at 701 (citing United States v. Leon, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 129 S. Ct. at 702.

The Supreme Court in Herring v. United States then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 129 S. Ct. at 703-04. Thus, it appears that, if the police make a negligent administrative error which results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

## ANALYSIS

This case puts at issue the admissibility of evidence found during the search of M. Sedillo's

home.  M. Sedillo makes a multi-tiered attack on the United States' use of that evidence against him. He first argues that the officers executed the search while M. Sedillo was unlawfully seized because the length of Guenther's traffic stop was constitutionally excessive.  He also argues that either he never gave Guenther consent to search the vehicle or that the consent he gave was involuntary. M. Sedillo asks that, if the Court finds Guenther's search of M. Sedillo's vehicle to be unconstitutional, the Court strike any information gained during that search from the warrant issued to search his home.  M. Sedillo further asks that, once the Court has stricken the information from the search warrant -- and even if it does not -- the Court find that the search warrant did not provide probable cause to justify a search of his home.  The United States disagrees with all of these contentions, arguing that the vehicle search was constitutional, that the search warrant for M. Sedillo's home was based on probable cause, and that the Court should not suppress any of the United States's evidence.

I.      **THE VEHICLE SEARCH WAS CONSTITUTIONAL**.

The parties agree that Guenther's initial stop of M. Sedillo's vehicle was lawful.  See Motion ¶ 11, at 7 (referring to the traffic stop as "Gunther's [sic] lawful stop").  The questions that the Court must address regarding the vehicle search are: (i) whether Guenther's asking or instructing M. Sedillo to consent to a search of his car impermissibly extended the lawful vehicle stop beyond its constitutional limits, yielding a constitutional violation; (ii) whether M. Sedillo gave consent to search his vehicle; and (iii) whether the consent which M. Sedillo gave to Guenther was voluntary. The Court concludes that Guenther's stop did not exceed permissible bounds; that M. Sedillo consented to the search; and that M. Sedillo's consent was voluntary.

A.      **GUENTHER'S STOP DID NOT EXCEED PERMISSIBLE BOUNDS.**

M. Sedillo's first argument is that, because Guenther's request to search the car occurred

after Guenther returned M. Sedillo's paperwork, the stop exceeded the scope of a permissible traffic stop.  See Motion at 5-6.  The Court is not convinced that Guenther's inquiry unconstitutionally extended the vehicle stop.  Guenther asked M. Sedillo for consent to search M. Sedillo's vehicle as Guenther was returning M. Sedillo's paperwork.  It would be unreasonable to hold that a police officer commits an unconstitutional seizure by asking a question or making a comment after returning a person's paperwork at the end of a valid traffic stop.  Consensual encounters between citizens and police officers are constitutional, see Schneckloth v. Bustamonte, 412 U.S. at 219; United States v. Reeves, 524 F.3d 1161, 1166 (10th Cir. 2008)("Encounters between police officers and citizens generally can be categorized as arrests, investigatory stops, or consensual encounters. Consensual encounters do not implicate the Fourth Amendment.")(citations omitted), and the Court cannot reasonably hold that an officer's request for a consensual encounter is itself an unconstitutional seizure.  In this case, upon return of M. Sedillo's vehicle registration and proof of insurance, Guenther quickly asked if M. Sedillo would allow him to search M. Sedillo's vehicle.[9] The inquiry itself was of negligible duration, and thus the issue whether the subsequent seizure was constitutional will turn on whether M. Sedillo gave consent and whether he gave that consent voluntarily.  If M. Sedillo voluntarily consented to the search, the Court finds that he consented for a search at that time and not some later time, and that he understood that he and his car would not be able to leave while that search was going on.

_____

[9] As set forth in the findings of fact, although Guenther phrased his request in the form of an assertion followed by a request for permission -- e.g., "I'm going to do such-and-such, is that alright?" -- the Court finds from Guenther's tone and M. Sedillo's testimony that Guenther was asking for permission, rather than disguising a forceful instruction. Tr. at 75:15-17 (Sedillo)("He hands me back my paperwork and said, 'well here's your paperwork back.  Now I need you to step out of the vehicle.'  And he said, 'Can I search your vehicle?'"); Guenther's Belt Tape at 2:10-3:00.

### B.      M. SEDILLO CONSENTED TO THE SEARCH OF HIS VEHICLE.

M. Sedillo's second argument is that M. Sedillo did not consent to the search of his vehicle. See Motion ¶ 12, at 8 ("Mr. Sedillo did not consent to a search of his vehicle[.]"); Tr. at 2:23-3:5 (Gonzales)("[A]ny purported consent that the Government alleges took place was not in fact given."). A vehicle search is lawful, even in the absence of probable cause or a warrant, if the vehicle's owner consents to the search. See Schneckloth v. Bustamonte, 412 U.S. at 219; United States v. Kimoana, 383 F.3d at 1221. The Court finds that M. Sedillo consented to Guenther's search of his vehicle.

The Court has found that Guenther executed a valid and constitutional traffic stop, then returned M. Sedillo's paperwork and inquired whether he could search M. Sedillo's vehicle. The parties disagree on what response M. Sedillo gave. Guenther testified that M. Sedillo nodded "yes" and made an affirmative sound, see Tr. at 19:9-20:11 (Guenther); id. at 20:18-23 (Guenther); Warrant and Affidavit at 5, but M. Sedillo testified that he shook his head "no," put his head down, and quietly said something to the effect of "even if I say no you're going to search my car anyway," see Tr. at 79:16-80:22 (Gonzales, Sedillo). Guenther's belt tape does not assist either one's testimony, because neither an affirmative sound nor a negative comment is audible on the belt tape recording. The issue is thus one of credibility that the Court must resolve in ruling upon this motion. See Fed. R. Evid. 104(a)("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court[.]"); Fed. R. Evid. 1101(d)(noting that the rules of evidence "do not apply [to] [t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104."). Based on his demeanor, the cogency and detail of his recollections, and the degree to which his recollections sync with the content of his belt tape recording, the Court finds Guenther's testimony to be credible and accurate on this issue. The Court

thus finds that M. Sedillo at least appeared to consent to the search of his vehicle.

The Court also finds persuasive that M. Sedillo testified that he understood that Guenther was asking permission to search and that he knew that he could refuse Guenther's request. See Tr. at 95:8-20 (Valencia, Sedillo); id. at 86:3-10 (Valencia, Sedillo)("Q:  So you knew -- you knew that you could tell them, 'I don't want you to search my car?'   A:   Yes, sir."). If M. Sedillo had intended to deny Guenther's request, he did not manifest his refusal in a way that a reasonable officer would have understood. The Court is thus left only with M. Sedillo's testimony that he shook his head and made a verbal statement that he did not consent, and Guenther's testimony that he nodded and made an affirmative sound. The Court credits Guenther's testimony on the issue.

The belt-tape recording is devoid of any statement by M. Sedillo that the Court can interpret as resisting Guenther's requests, until at a point at which the officers had identified contraband inside the vehicle. Before that moment, according to Guenther's testimony, M. Sedillo appeared to be voluntarily complying with Guenther's requests. Specifically, after the searching officers -- with knowledge that M. Sedillo had a felony conviction on his record -- found a shotgun shell in M. Sedillo's vehicle, they asked M. Sedillo if they could "go look" and see if M. Sedillo has any guns.[10] At that point, the presence of the shotgun shell and knowledge that M. Sedillo was a felon was sufficient probable cause to place M. Sedillo under arrest. See 18 U.S.C. § 922(g)("It shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."); Guenther's Belt Tape at 3:45-4:00

---

[10] The Court finds it likely that the office was referring to going to M. Sedillo's home and searching there for weapons. M. Sedillo clearly did not, based on his statements, give consent for that search.

("UNIDENTIFIED OFFICER: Did you know that it's illegal, by federal law, for you to be around even ammunition?  M. SEDILLO: I didn't know actually . . . .").  It is only at this point, after the officers developed probable cause, that M. Sedillo responded: "You got a search warrant, you know what I mean?  I know my rights."  Guenther's Belt Tape at 4:30-5:00.  It was also at this point that Guenther apparently handcuffed M. Sedillo and placed him in the police car.  See Guenther's Belt Tape at 4:30-5:15.

### C.    M. SEDILLO'S CONSENT WAS VOLUNTARY, AND NOT COERCED OR MADE UNDER DURESS.

The central issue in this case is whether M. Sedillo's consent was voluntary.  The Court concludes that it was.

The Tenth Circuit has given the district courts seven non-exhaustive factors to consider when determining whether a defendant's consent to search was voluntary.  Those are: (i) the threatening presence of several officers; (ii) whether the officer used aggressive language and tone of voice indicating that compliance with an officer's request is compulsory, or used a pleasant manner and tone of voice; (iii) whether the officer retained the person's papers or personal effects for a long period of time, or promptly returned them; (iv) whether the stop occurred in a public location, in view of others, or in a secluded locale; (v) whether the officer advised the defendant that he or she was free to leave; (vi) whether the officer displayed a weapon; and (vii) whether the officer physical touched the person.  See United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources); United States v. Anderson, 114 F.3d at 1064.

The Court has reviewed the testimony and the belt tape, and is confident that M. Sedillo's consent was freely and voluntarily given.  First, M. Sedillo testified that there were three officers in the area, but that only Guenther approached M. Sedillo before M. Sedillo's consent to search.  See

Tr. at 19:13-20:11 (Guenther); id. at 76:18-77:22 (Gonzales, Sedillo).  Guenther used a polite tone of voice, as M. Sedillo testified, and Guenther sounded as though he was genuinely seeking permission to search M. Sedillo's vehicle. See Tr. at 76:13-17 (Sedillo); id. at 95:8-20 (Valencia, Sedillo); Guenther's Belt Tape at 2:10-3:00.  Guenther retained M. Sedillo's papers for only about five minutes before returning them to M. Sedillo and asking for permission to search the vehicle. See Tr. at 75:6-17 (Gonzales, Sedillo).  The stop occurred on Louisiana between Central Avenue and Lomas Boulevard, see Tr. at 23:6-11 (Valencia, Guenther), a stretch of road that is not densely populated, but which has consistent traffic in both directions and several small businesses.  It is true that Guenther did not inform M. Sedillo that he was free to leave, but M. Sedillo testified that, based on his past experience in the criminal justice system, he knew that he had a right to refuse Guenther's request to search the vehicle.  See Tr. at 86:3-10 (Valencia, Sedillo); id. at 87:8-12 (Valencia, Sedillo).  Guenther did not draw his weapon, did not place his hand threateningly on or near the weapon, or otherwise threaten or attempt to intimidate M. Sedillo.  See Tr. at 22:13-16 (Valencia, Guenther); id. at 47:15-48:7 (Gonzales, Guenther); id. at 51:16-52:18 (Valencia, Guenther).  Finally, there was no evidence that Guenther touched M. Sedillo until M. Sedillo exited the vehicle and consented to a pat-down search.  In short, six of the seven factors enunciated by the Tenth Circuit favor a finding that M. Sedillo's consent was voluntary.  The Court concludes that M. Sedillo's consent was freely and voluntarily given.  Thus, the Court finds no constitutional violation, and the Court need not suppress the information in the search warrant used to search M. Sedillo's home.

## II.   THE OFFICERS QUALIFY FOR THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE.

If the warrant lacked probable cause, the search would have been executed in violation of

the Constitution.  See Katz v. United States, 389 U.S. at 357; United States v. Burgess, 576 F.3d at 1087.  Ordinarily, a search made in violation of a person's constitutional rights would require that the obtained evidence be excluded as to that person.  See United States v. Calandra, 414 U.S. at 347. Federal courts, however, apply the good-faith exception to the exclusionary rule, such that, where the police obtained a warrant but the affidavit supporting the warrant fails to show probable cause, suppression of the evidence found is not warranted so long as the officers relied in good faith on the warrant.  See United States v. Tuter, 240 F.3d at 1300; United States v. Danhauer, 229 F.3d at 1007. Where a defendant seeks suppression of evidence because the search warrant with which it was acquired lacked probable cause, a court can forego the probable-cause analysis and proceed directly to an analysis whether the good-faith exception of Leon v. United States would make the evidence admissible.  See United States v. Danhauer, 229 F.3d at 1005 ("In reviewing suppression motions, courts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question.").  The Court will thus decline to rule on the issue of probable cause and rule that the good-faith exception applies to the officers' conduct.

None of the situations in which the Tenth Circuit and the Supreme Court have determined that the good-faith exception should not apply are present here.  There is no evidence that the warrant-issuing judge was mislead, and the Court has found that the information garnered from the search of M. Sedillo's vehicle was properly included in the affidavit.  There has been no allegation of or evidence that Judge Whitaker abandoned his judicial role and became part of the investigating team when issuing the warrant.  The warrant was not so lacking in indicia of probable cause to render the officers' reliance upon it unreasonable.  Finally, the warrant was not facially deficient.

The Tenth Circuit has addressed a case similar to this one in United States v. Danhauer and found that the good-faith exception applied.  In United States v. Danhauer, Officer Dumas received

-34-

an anonymous tip that Robbi and Dennis Danhauer were cooking methamphetamine in their garage. See 229 F.3d at 1004.  The informant's tip apparently consisted only of the fact that the Danhauers were cooking methamphetamine in their garage, a physical description of the Danhauers and their property, and that a man named "Casey" was acting as the lookout for the operation.  See id.  Dumas passed this information along to Detective McCarthy.  McCarthy confirmed the informant's physical description of the property, the fact that the Danhauers occupied it, and that the Danhauers periodically went back and forth between the house and garage.  See id.  McCarthy checked the criminal backgrounds of the Danhauers, and found that "their criminal histories included dangerous drugs, possession of paraphernalia, assault, forgery, and criminal mischief," and that both Danhauers had outstanding arrest warrants.  Id. (alterations omitted).  Finally, McCarthy discovered that R. Danhauer had been subject to a urinalysis the previous day, and had tested positive for opiates and methamphetamine.  See id.

McCarthy took the information that he had and applied for a search warrant, which a state judge in Utah then issued.  See id.  The warrant authorized the search of the Danhauers and their property.  See id.  The search resulted in drug and weapons charges being brought against D. Danhauer.  See id. at 1005.  D. Danhauer  moved to suppress the evidence found, alleging that the facts outlined in the warrant affidavit were insufficient to establish probable cause.  See id.  The Magistrate Judge to whom the issue was referred found that probable cause did not support the warrant, but nevertheless denied the motion because the good-faith exception applied.  See id.  The district court declined to re-analyze the probable-cause question, upholding the Magistrate Judge's decision on the basis of good faith.

On appeal, the Tenth Circuit found that the affidavit did not establish probable cause:

> The affidavit in this case failed to allege facts sufficient to establish probable

cause.  The affidavit contains repetitive statements regarding the physical description of the Danhauer residence and the identity of the occupants.  Further, the affidavit contains statements about the criminal histories of both Dennis and Robbi Danhauer.  The affidavit does not reveal, however, the informant's basis of knowledge or adequately verify the informant's most serious allegation, that the Danhauers were manufacturing methamphetamine.  An affidavit replete with repetitive and tenuous facts does not provide a magistrate with a sufficient basis for drawing a reasonable inference that a search would uncover evidence of criminal activity.

. . . The only police corroboration of the informant's information was the affiant's verification of the Danhauer residence's physical description, a records check to confirm that the Danhauers resided at the premises in question, an observation of Robbi Danhauer coming and going from the house to the garage, and a search of the Danhauers' criminal histories, which brought to light Robbi Danhauer's latest urinalysis revealing the presence of methamphetamine.  The detective made little attempt to link methamphetamine to the Danhauer residence.  The only possible nexus between Danhauer's residence and the alleged criminal activity was his wife's urinalysis result.  This is not the type of evidence that enables the state magistrate to draw a reasonable inference that the items subject to the search warrant would be located at Danhauer's residence.  Such a nebulous connection does not give a magistrate a substantial basis for concluding that probable cause existed.

229 F.3d at 1005.  Nevertheless, the Tenth Circuit upheld the decision because the good-faith exception applied.

Although the affidavit in support of the warrant did not establish probable cause, it was not so lacking in indicia of probable cause that the executing officer should have known the search was illegal despite the state magistrate's authorization.  Further, the absence of information establishing the informant's reliability or basis of knowledge does not necessarily preclude an officer from manifesting a reasonable belief that the warrant was properly issued, particularly when the officer takes steps to investigate the informant's allegation.  Detective McCarthy, who both obtained and executed the search warrant, reasonably believed the fruits of his investigation into the informant's allegation sufficiently linked the manufacture of methamphetamine and Danhauer's residence. His affidavit contains more than conclusory statements based on the informant's allegation about the alleged criminal activity at Danhauer's residence.

229 F.3d at 1007.

This case is similar to United States v. Danhauer.  The anonymous tipster told Lucero that the Sedillos were trafficking drugs out of their house on 412 California, gave physical descriptions

of the Sedillos, and stated that J. Sedillo -- whom Lucero determined to be Juanita Candelaria -- possibly had a warrant out for her arrest. Lucero sought to confirm the details that the informant provided to her. She confirmed that the Sedillos appeared to live in 412 California and confirmed their criminal histories, but observed no other suspicious activity. Also similar to United States v. Danhauer, the warrant affidavit in this case did not "reveal . . . the informant's basis of knowledge or adequately verify the informant's most serious allegation" that the Sedillos were trafficking drugs out of their home. 229 F.3d at 1006. Guenther obtained permission to search M. Sedillo's car and found a drugs, paraphernalia, and a shotgun shell. The connection between the drugs found in M. Sedillo's car and drug trafficking from M. Sedillo's house seems almost as tenuous as the connection between R. Danhauer testing positive for methamphetamine and the Danhauers manufacturing methamphetamine in their garage. It is thus questionable whether the affidavit in this case established probable cause. The Court therefore declines to decide whether probable cause existed to support the warrant, but rather finds that the good-faith exception applies in this case. See United States v. Danhauer, 229 F.3d at 1005 ("In reviewing suppression motions, courts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question.").

The Court finds that, as in United States v. Danhauer, the affidavit is not so lacking in indicia of probable cause that Guenther and the other executing officers should have known that probable cause was lacking. The officers tried to investigate the informant's allegations and find additional evidence of drug trafficking from the Sedillos' house, and the officers thought they had been successful. The Court finds that this case is analogous to United States v. Danhauer and that it should therefore not exclude the evidence that the officers found while searching M. Sedillo's house.

The officers accumulated evidence that they believed established probable cause to search

M. Sedillo's home.  They then went to a New Mexico judge, honestly set forth what they had found, and the judge agreed that the evidence established probable cause.  If Judge Whitaker had been incorrect and the evidence had failed to show probable cause, the officers had still done what the Fourth Amendment asks of them, and engaged in no conduct that the law would seek to deter. Exclusion of the evidence would thus fail to promote the policies underlying the exclusionary rule. See Herring v. United States, 129 S. Ct. at 702 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").  Thus, under the good-faith exception of United States v. Leon and, more recently, Herring v. United States, exclusion of the evidence in this case is not warranted.  In short, regardless whether the warrant established probable cause -- an issue the Court does not decide -- the Court denies M. Sedillo's motion to suppress because the good-faith exception to the exclusionary rule would apply in any event.

**IT IS ORDERED** that Defendant Mark Sedillo's Motion to Suppress Evidence Unlawfully Seized from Defendant's Vehicle and Home is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
   United States Attorney
Louis E. Valencia
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Benjamin A. Gonzales
  Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*